UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ENDEAVOR ENERGY RESOURCES, L.P.; | § | |
| and ACME ENERGY SERVICES, INC. | § | |
| d/b/a BIG DOG DRILLING and d/b/a RIG | § | |
| MOVERS EXPRESS, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-03765-B |
| | § | (Appeal of Adversary No. 11-3047) |
| HERITAGE CONSOLIDATED, LLC and | § | |
| HERITAGE STANDARD | § | |
| CORPORATION, | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is an appeal of the bankruptcy court's orders granting summary judgment in favor of Appellees, granting Appellee's Motion to Dismiss Additional Claims Asserted in Amended Complaint, and granting final judgment dismissing Appellants' claims in Adversary Case No. 11-3047. Having considered the appeal, the Court finds that the bankruptcy court's determinations should be and hereby are **AFFIRMED**.

### I.

### FACTUAL BACKGROUND

This case concerns certain oil well drillers' attempts to recover unpaid debts from an oil well owner. Heritage Standard Corporation ("HSC") owned mineral property leases on a nonfunctioning oil well in Winkler County, Texas and on January 23, 2008, entered a contract ("Staley Agreement")

with George Staley for the development of the well.[1] R. 850.[2] On the same day, Staley entered into an assignment contract ("Lake Hills Agreement") with Thomas Stratton's Lake Hills Productions, Inc. ("Lake Hills") to perform the work. R. 2165. All interested parties signed a Joint Operating Agreement ("JOA") dated January 25, 2008 for the development of the well. R. 864. The JOA designated Stratton's Stratco Operating Co., Inc. ("Stratco") as the official operator of the well development, with Lake Hills and HSC responsible for 87.5% and 12.5% of the working expenditures, respectively. R. 889. Lake Hills sold and assigned its interests to Trius Energy, LLC ("Trius") on February 1, 2008, R. 860, and Trius was added to the JOA in September 2008, R. 903. Ultimately, the working expenditures were shared between HSC and Trius, with each responsible for 12.5% and 87.5% of the expenditures, respectively. The payments were to be made to Lake Hills, which replaced Stratco as the official operator in July 2008, R. 754, although it had been acting as the operator of the well from the beginning of the well project.

In May, June, and July of 2008, Appellants Endeavor Energy Resources, L.P. and Acme Energy Services, Inc. (collectively "Drillers") contracted with Lake Hills and performed work on the well. R. 918, 1003, 1038. However, both Trius and HSC stopped making payments to Lake Hills in the late summer of 2008, R. 2656, and Lake Hills failed to pay the Drillers. Both Lake Hills and the Drillers then filed liens against HSC. R. 1898, 2323. HSC assigned its interest in the well to Heritage

---

[1]The Staley Agreement was a "farmout agreement." A farmout is a contract "whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract." 8-F Williams & Meyers, Oil Gas Law Scope. "The primary characteristic of the farmout is the obligation of the assignee to drill on or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." *Id.*

[2]The Court drops any leading zeros in the record citations, and thus cites to "R. 850" rather than "R. 000850."

Consolidated, LLC ("Consolidated") at the end of October 2008, R. 732, and named itself the well operator pursuant to the terms of the JOA in November 2008, R. 907.[3]

Due to the default of several parties on their contract obligations, HSC, Consolidated, Trius, Stratco, Lake Hills, and Staley negotiated a settlement agreement ("Settlement Agreement") in May 2009. R. 1853. The settlement rearranged the interests of the parties, with Lake Hills receiving only a 1% interest in the well in consideration for its release of its operator liens against HSC and Consolidated (collectively "Debtors"). R. 1859-60. The Settlement Agreement also stipulated that Trius was obligated to satisfy the Drillers' liens and to indemnify all other signees against claims arising from those liens. R. 1859. In consideration for Trius's agreement to discharge the liens, Debtors forgave Trius' 87.5% share of the working expenses incurred by Debtors after Debtors took over well operations in November 2008. R. 1860.

Trius and Debtors entered into a companion agreement ("Option Agreement") in May 2009. R. 1973. The Option Agreement references Trius's obligation to terminate all remaining liens on the well, including the Drillers' liens, and contains penalties for Trius' failure to do so. Debtors would retain 100% of Trius' production interest in the well up to the lesser of $9,650,000 or 600% of the total amount of the outstanding liens. R. 1974. The Option Agreement also stipulates that Debtors are "authorized to attempt to settle, terminate, and obtain releases of the Materialman's Liens."[4] R.

---

[3] The JOA contained a provision that the well operator could be removed for cause by a majority vote of the working interest owners. R. 870. Consolidated and Trius replaced Lake Hills with HSC as the operator in November 2008. R. 907.

[4] A materialman's or mechanic's lien is "a statutory lien that secures payment for labor or materials supplied in improving, repairing, or maintaining real or personal property." Black's Law Dictionary 1008 (9th ed. 2009). As used in the Option Agreement, "Materialman's Liens" refers to all liens attached to the Hill Well, including the Drillers' liens. R. 1898. The Drillers specifically perfected liens on the mineral leasehold of the Hill Well.

1975. Trius failed to perform its contract obligations and Debtors have collected Trius's production

interest in the well since 2009. R. 3390. No party has paid the Drillers for their services.

## II.

## PROCEDURAL HISTORY

This appeal arises from the bankruptcy court's order of summary judgment in favor of the

Debtors and order granting Appellee's Motion to Dismiss Additional Claims Asserted in Amended

Complaint. The bankruptcy court entered judgment against the Drillers on all claims.

The court determined that the Drillers had no express or implied contract with the Debtors

and that Lake Hills was not an agent, joint-venturer, or partner of the Debtors. Therefore, according

to the court, the Drillers were not contractors of the Debtors and had no right to a contractor's lien

against the mineral leasehold. The lower court also concluded that the Drillers had no right to a

subcontractor's lien against the mineral leasehold since Lake Hills was a mineral property owner of

the leasehold when it contracted with the Drillers. Therefore, the mineral contractor liens of the

Drillers only attached to the equitable interests of Lake Hills at the time of contracting, in the

bankruptcy court's view.

The bankruptcy court also dismissed the constructive trust and equitable lien claims of the

Drillers. The court reasoned that there was insufficient pleading to show a fiduciary duty or fraud,

necessary components of a constructive trust claim. Furthermore, the court concluded that the

equitable lien claim was not adequately pled because the Drillers and the Debtors did not agree to

create any security interest between them, and there is a remedy at law for the Drillers, violating two

requirements of an equitable lien.

## III.

## JURISDICTION

This is an appeal of the bankruptcy court's order and final judgment disposing of all claims in Adversary Proceeding No. 11-3047. The bankruptcy court had jurisdiction over the underlying adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. As the Court's summary judgment order, order of dismissal, and final judgment resolved all claims and counterclaims raised in the adversary proceeding, this Court is now vested with jurisdiction over the appeal of that order and judgment pursuant to 28 U.S.C. § 158(a)(1).

## IV.

## LEGAL STANDARDS

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a)(1) (1994 & Supp. 2005); Fed. R. Bankr. P. 8001(a). The district court functions as an appellate court and applies the same standard of review used by federal appellate courts when reviewing the decisions of district courts. *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). The Court reviews the bankruptcy court's findings of fact for clear error, and its conclusions of law and mixed law and fact questions *de novo*. *McLain v. Newhouse (In re McLain)*, 516 F.3d 301, 307 (5th Cir. 2008); *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 135 (5th Cir. 2008).

A.      *Standard for Summary Judgment*

A trial court's grant of summary judgment is reviewed *de novo*. *Burgos v. Sw. Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994); *see also Hosack v. I.R.S.*, Civ. Action No. 3:06-cv-1643-P, 2007 WL 959034, at *2 (N.D. Tex. Mar. 30, 2007) (citing *Burgos* and applying *de novo* standard in reviewing bankruptcy court's grant of summary judgment). Under Rule 56(c) of the Federal Rules of Civil

Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. SmithKline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990) Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

B.      *Standard for Dismissal Under Rule 12(b)(6).*

A reviewing court examines dismissal under Rule 12(b)(6) *de novo*. See *EPCO Carbon Dioxide Prods. Inc. v. JP Morgan Chase Bank, N.A.*, 467 F.3d 466, 469 (5th Cir. 2006). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Ashcroft v. Iqbal*, 550 U.S. 544, 678 (2009).

# V.

## ANALYSIS

Drillers raise many points on appeal.[5] The majority of these issues concern whether or not Lake Hills, the party with which the Drillers expressly contracted, owned the mineral property rights of the Hill Well, or if Lake Hills was a contractor, agent, partner, or joint-venturer of the Debtors. The parameters of Lake Hills' relationship with the Debtors affect whether or not the Drillers can successfully attach a lien to the interests of the Debtors. Drillers also challenge the dismissal of their equitable lien or constructive trust claims against Debtors. Regarding procedure, Drillers object to the bankruptcy court's denial of Driller's request for leave to amend their complaint and the court's failure to rule on a motion to strike. The Court will address these contentions below.

A.    *The Drillers are not contractors of the Debtors.*

The nature of the Drillers' relationship with the Debtors determines whether or not the Drillers' liens may attach to the interests of the Debtors. *See Bethlehem Supply Corp v. Wotola Royalty Corp.*, 140 Tex. 9 (Tex. 1942). If the Drillers had an implied or express contract with Debtors, then they are contractors of the Debtors. *See* Tex. Prop. Code Sec. § 56.001(2). Likewise, if Lake Hills was the agent, joint-venturer, or partner of Debtors, then Drillers are contractors as to Debtors. *Id.* After consideration, the Court concludes that the summary judgment evidence does not raise a genuine issue of material fact as to either possibility.

1.    <u>Drillers had no express or implied contract with the Debtors.</u>

Based on the parties' summary judgment evidence, there is no genuine issue of material fact

---

[5] The Drillers designate twenty-three issues on appeal. Many of these points are redundant and the Court therefore focuses only on the main errors presented.

as to the existence of an express or implied contract between Debtors and Drillers. An implied contract requires a mutual agreement to enter a contract and cannot exist when an express contract covers the same subject matter. *See Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964) (stating "[w]here there exists a valid express contract covering the subject matter, there can be no implied contract"); *Noble Exploration, Inc. v. Nixon Drilling Co.*, 794 S.W.2d 589, 592 (Tex. App.–Austin 1990) (refusing to recognize an implied contract between a driller and a mineral property owner because an express contract covered the same subject matter). Texas courts have long held that an action for *quantum meruit* also cannot be recognized when there is an express contract that outlines the plaintiff's compensation. *See, e.g. Kittyhawk Landing Apartments III v. Anglin Constr. Co.*, 737 S.W.2d 90, 92 (Tex. App.–Houston 14th Dist. 1987).

Here, there is no express contract between Debtors and Drillers. It is undisputed that the parties never communicated with each other nor entered into any express agreements. There is also no evidence that an implied relationship existed between Debtors and Drillers. The Staley Agreement obligates Staley to "turn the re-entry to a third party," R. 851, but that alone does not create an implied contract between the Debtors and Drillers. *See Noble Exploration*, 794 S.W.2d at 591 (demonstrating that an owner/farmor did not have an implied contract with a driller even though the farmee who hired the driller was a part owner of the owner/farmor's company and knew the work would be contracted out).

Also, if mere knowledge that the farmee could contract out work to third parties created an implied contract, then case law and statutes discussing subcontractors as a category would be rendered an anachronism because any subcontractor would presumably be a contractor by virtue of an implied contract with the owner. Furthermore, the Staley Agreement, Lake Hills Agreement, and

Drillers' contracts all detail the work and compensation for its signees, so an implied contract cannot also exist between the Debtors and Drillers covering the same subject matter. *See Woodard*, 384 S.W.2d at 675.

    2.     <u>Lake Hills was not the agent, joint-venturer, or partner of the Debtors.</u>

Drillers alternatively argue that they are properly categorized as contractors of the Debtors because Lake Hills was the agent, joint-venturer, or partner of the Debtors. *See* Tex. Prop. Code § 56.001(2). If an agency, joint-venture, or partnership relationship exists, then the actions of Lake Hills are imputed to the Debtors. However, here there is no evidence that any of these relationships existed between Lake Hills and the Debtors.

    i.     There is no agency between Lake Hills and Debtors.

Neither the express terms of the contractual agreements between Lake Hills and the Debtors, nor the behavior of the parties creates an agency relationship. In order for a party to be labeled an agent of the principal owner, the alleged agent must behave with either actual or apparent authority of the principal. *Reliant Energy Serv's., Inc. v. Cotton Valley Compression, LLC*, 336 S.W.3d 764, 783 (Tex. App.–Houston 1st Dist. 2011). Actual authority depends on the principal explicitly conferring authority on the alleged agent or purposefully or negligently allowing the alleged agent to believe he has the authority to act on behalf of the principal. *Id.* at 783. The principal must lead a third party to believe that the alleged agent has the authority of the principal in order for any claim of apparent authority to exist. *Gaines v. Kelley*, 235 S.W.3d 179, 182 (Tex. 2007).

Further, there is no evidence in the record that Lake Hills had the actual or apparent authority of the Debtors when Lake Hills contracted with the Drillers. Drillers claim that the language of the Staley Agreement conferred actual authority to Lake Hills to contract with laborers.

As discussed above, this argument is unpersuasive. Simply because a contract may be assigned does not create an agency relationship between a driller and the owner. *See Noble Exploration*, 794 S.W.2d at 592 (indicating that even though the owner and his farmee both knew that the work would be contracted out, that alone does not establish agency).

Further, there is no evidence that Staley or Lake Hills believed themselves to be the agents of the Debtors. To the contrary, Lake Hills expressly indemnified Debtors against all claims. R. 2165. Also, the JOA dated January 25, 2008 states that none of the signatories, including HSC and Lake Hills, should be understood as being in an agency relationship. R. 877. Regarding apparent authority, there is no evidence in the record that Lake Hills ever indicated to the Drillers or anyone else that Lake Hills was acting as an agent or proxy of the Debtors, and the Debtors likewise made no such representations.

Drillers also argue that Lake Hills was the *de facto* agent of HSC because the parties were cooperating before the JOA was signed.[6] The record does not support this conclusion. Staley assigned the farmout contract to Lake Hills the same day Staley received it. R. 2165. All parties understood that a JOA was forthcoming. The "informal arrangement" between HSC and Lake Hills followed the parameters of the Staley Agreement and the JOA that was completed in June. Furthermore, Lake Hills and Stratco signed the JOA in April 2008, before the Drillers began work on the well, so even if there was actual or apparent agency before the execution of the JOA, there is no evidence that the Drillers relied on such agency when contracting with Lake Hills. *See Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 246 (Tex. App.–Corpus Christi 2008) (requiring reliance

---

[6]Thomas Stratton, on behalf of Lake Hills and Stratco, signed the JOA on April 29 and 30, 2008. R. 886. HSC did not sign it until June 12, 2008. *Id.* The agreement had an effective date of January 25, 2008. R. 864.

on the principal's words or conduct in order to create apparent agency).

          ii.      Lake Hills and Debtors are not Partners or Joint-Venturers.

The record also lacks evidence creating a genuine dispute of material fact as to whether Lake Hills and Debtors had a partnership or joint-venture in place. A joint-venture or partnership requires a community of interest in the venture, an agreement to share profits and losses, and a mutual right of control of the enterprise. *See Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex. 1978). Texas courts have discussed several factors that are insufficient to prove a joint venture or partnership. "[J]oint ownership without joint operation by the cotenants does not effectuate a mining partnership." *Templeton v. Wolverton*, 142 Tex. 422, 428 (Tex. 1944). Having working expenditure obligations does not automatically create a partnership or joint-venture. *See Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 144 Tex. 475, 483 (Tex. 1945); *Wagner Supply Co. v. Bateman*, 118 Tex. 498, 505 (Tex. 1905); *Rucks v. Burch*, 138 Tex. 79 (Tex. 1941); *U.S. Truck Lines v. Texaco, Inc.*, 337 S.W.2d 497, 500 (Tex. App.–Eastland 1960); *In re Mid-Am. Petroleum, Inc.*, 83 B.R. 937, 944 (Bankr. N.D. Tex. 1988). Owners' visits to a mine site do not show evidence of joint control. *See Ayco Dev. Corp. v. G.E.T. Service Co.*, 616 S.W.2d 184, 186 (Tex. 1981); *Templeton*, 142 Tex. at 431. An owner giving advice on the well, receiving information about the progress of the well, and knowing who is working on the well is not enough to show joint operation. *See Templeton*, 142 Tex. at 431. The owner must actually participate in the operation of the well before it can be deemed a partner or joint-venturer of the other operators. *See Wagner*, 118 Tex. at 505.

Drillers claim that partnership is proven anytime "co-owners work a mine." *See Wagner*, 118 Tex. at 505. However, *Wagner* differs significantly from the present case. In *Wagner*, a leasehold owner contracted for the construction of a mine. The leasehold owner agreed to "furnish the rig,

casing, water, gas, etc." and the contractor was to supply the labor. *Id.* at 504. The contractor was paid a 25% interest in the leasehold when the mine was completed. *Id.* The court determined that the contractor was partnered with the owner because he purchased his ownership in the mine with labor instead of money and he co-operated the mine with the leasehold owner. *Id.* at 505.

Here, there is no evidence that the Debtors were joint-operators of the well before they assumed control of well operations in November 2008. HSC never visited the well and there is only evidence that they attended one meeting regarding ongoing well operations. R. 2652. The Debtors did receive updates on the well's status, daily reports of well operation, and even proposals of well construction to estimate expenses. Even with these updates, though, there is no evidence that they were participating in the Hill Well's operation or directing the construction whatsoever. The Drillers point to one line in Stratton's affidavit where he said that if HSC disapproved of something, Stratco and Lake Hills would not have proceeded, R. 2269-70, but there is no evidence in the record that HSC exercised that alleged authority or attempted to direct operations on the ground.

Drillers also argue that reliance on the case law definition of a joint venture is misplaced because the JOA listed Stratco, instead of Lake Hills, as the operator of record when the Drillers furnished their work. Regardless of the contractual posture of Lake Hills and the Debtors, the parties did not behave as joint operators at any point prior to the revocation of the JOA in November, so the claim that Lake Hills and Debtors were impliedly joint-venturers or partners is unpersuasive. Overall, there is no genuine issue of material fact as to whether Lake Hills was the agent, joint-venturer, or partner of the Debtors.

B.    *Lake Hills was a mineral property owner and the Drillers' liens attach to Lake Hills.*

The Debtors contend that Lake Hills was a mineral property owner at the time it contracted

with the Drillers and refer the Court to *Hoffman v. Continental Supply Co.* for three factors that can indicate that a party is an "owner." *See* 120 S.W.2d 851, 854 (Tex. Civ. App. 1938), *modified on other grounds*. If an alleged owner possesses legal or equitable title in the property, is entitled to specific performance of an assignment of the property interest, or later obtains assignment, then the party is an owner. *Id.* Mere contemplation of acquisition of title is not likely to create an ownership interest such that a lien may attach; the contracting party must have "some interest in the property either legal or equitable." *Diversified Mortg. Investors v. Lloyd Blaylock General Contractor*, 576 S.W.2d 794, 805 (Tex. 1978). Further, under the "after-acquired title" or the "relation back" doctrine, a lien "attaches to whatever legal or equitable interest the contracting party had when the work was begun, and thereafter attaches to any other or greater interest whenever acquired before the lien is enforced: provided that the after-acquired title enlarges an estate or interest to which the lien has already become attached." *Id.* at 805-06.

This case presents a difficult fact situation. Lake Hills was entitled to all of Staley's earned interest except for a one-quarter carried working interest retained by Staley. R. 2165- 2170. Then Lake Hills sold the majority of its interests in the Hill Well to Trius, and upon completion of the well, Trius would receive a 58.125% working interest and Lakeills would retain a 7.5% carried working interest. R.860-862. For reasons that are not fully explained in the record, HSC stopped paying Lake Hills. In response, Lake Hills filed an operator's lien against HSC. HSC and Trius then removed Lake Hills as the well operator under a revocation clause of the JOA on or about November 11, 2008. R 755, 907. The reason given in the notice of removal was that Lake Hills was unable to continue as the well operator and had thus resigned that position. Nevertheless, when Drillers filed

their lien,[7] Lakehills had an equitable interest to which the lien attached and had performed work on the well. Nearly six months later, Lake Hills removed its operator's lien against HSC in exchange for a 1% ownership interest in the well. Thus, under the relation-back doctrine, Driller's liens attached to the 1% ownership interest Lakehills eventually obtained. While such interest was obtained pursuant to the Settlement Agreement, the Court sees no reason why this interest should not be subject to Drillers' lien under the relation-back doctrine.

The Court recognizes that Lake Hills did not possess legal or equitable *title* at the time Drillers filed their lien. *See Smith v. DASS, Inc.*, 283 S.W.3d 537, 542 (Tex. App.–Dallas 2009) (holding that "equitable title is the present right to compel legal title"). Lakehills had not performed all its obligations and thus did not have the right to compel legal title to its share of the Hill Well. It did, however, possess an equitable *interest* in the property pursuant to the JOA and it had begun performance pursuant to the JOA and Staley Agreement. *See Johnson v. Wood*, 157 S.W.2d 146, 148 (Tex. 1941) (party that contracted to buy parcel of land merely had equitable right to land until performance of obligations under contract). *Diversified Mortgage* indicates that a person contracting with a materialman must have some interest in the property either legal or equitable upon which the lien may attach. 576 S.W.2d at 805. Here, Lakehills was entitled to legal title upon completion of the well and did work towards such completion, though it was eventually removed as operator. Further, Lakehills later did receive a 1% working interest. Although it is a close question, the Court finds that under *Diversified*, *Hoffman*, and related cases,[8] Lakehills was a mineral owner.

---

[7]Drillers served mineral lien notices on Appellees on December 11, 2008 and filed lien affidavits on December 23, 2008. R. 2886-28895.

[8]*See, e.g.*, *Bethlehem*, 140 Tex. 9 at 14 (lien extends "only to the property owned by the person under whose auspices the labor or materials are furnished"); *Grube's v. Nick's No. 2*, 278 S.W.2d 252 (Tex. Civ.

Accordingly, Drillers were contractors of Lakehills, and Drillers' lien attached whatever interest Lakehills had at the time of the filing of the Drillers' liens and later to Lakehill's 1% interest it obtained as a result of the Settlement Agreement. Given that Lakehills was an owner for the purposes of Driller's liens, such liens do not attach to Debtors' interest. As such, there is no genuine dispute of material fact as to whether Drillers have a contractor's or subcontractor's lien on Debtors' interest in the Hill Well.[9]

C.     *The bankruptcy court did not err in dismissing equitable lien and constructive trust claims.*

The Drillers also allege error in the bankruptcy court's dismissal of their constructive trust and equitable lien claims. As previously mentioned, a court may dismiss complaints that do not allege a plausible claim. To be plausible, a claim must plead factual support that allows the court to infer that the defendant is likely liable for the alleged conduct. The Court concludes that the Drillers have failed to state plausible constructive trust and equitable lien claims, and thus dismissal of those

---

App.–El Paso 1955) (representing a fact situation and ruling nearly identical to *Bethlehem*); *Youngstown Sheet & Tube Co. v. Penn*, 344 S.W.2d 239, 246 (Tex. Civ. App.–Austin 1962) (concluding that material suppliers who contracted with a part owner could not attach a lien to the interests of non-operating owners), *aff'd and modified on other grounds*. *But see Fed. Deposit Insur. Corp. v. Mid-Am. Petroleum, Inc.*, 83 B.R. 933, 934-35 (Bankr. N.D. Tex. 1988) (finding that working interest owner that owned oil and gas leases jointly with non-operating owners "put on a different hat and became a mineral contractor," with respect to non-operating owners, and thus parties with whom the working interest owner contracted were mineral subcontractors with respect to the non-operating owners).

[9]Debtors also point to Texas Property Code § 56.045 as support for their contention that Lakehill's failure to convert its equitable interest into legal title did not prevent Drillers' lien from attaching to Lakehill's interest. Section 56.045 states:

> Failure of an equitable interest to become legal title or nonfulfillment of a condition subsequent on which a legal interest is contingent does not impair a lien on material, machinery, supplies, or an improvement located on the land covered by the equitable interest if the lien attached to the material, machinery, supplies, or improvement before the failure.

However, this section does not contain any reference to leaseholds or oil or gas wells, in contrast to § 56.003, which lists property subject to mineral liens, suggesting that § 56.045 does not apply to this case.

claims was proper.

A constructive trust first requires a breach of fiduciary duty or fraud, accompanied by unjust enrichment of the wrongdoer and traceability to a res. *Haber Oil Co. v. Swinehart (In re Haber Oil)*, 12 F.3d 426, 437 (5th Cir. 1994). A fiduciary duty must come from a preexisting relationship beyond mere business interactions. *See Harris v. Sentry Title Co., Inc.*, 715 F.2d 941, 946 (5th Cir. 1984) (holding "[i]n recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship prior to and apart from the transaction in question."). *See also In re Monnig's Dep't Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. Tex. 1991); *Consol. Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333, 336 (Tex. 1966) (stating "the fact that one businessman trusts another, and relies upon his promise to carry out a contract, does not create a constructive trust.")

First, the Drillers argue that the Texas Trust Fund Statute created a fiduciary relationship between Debtors and Drillers. The statute states, "[c]onstruction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor . . . under a construction contract for the improvement of specific real property in this state." Tex. Prop. Code § 162.001(a). HSC became the well operator in November 2008, and the Drillers contend that since HSC replaced Lake Hills as the contractor, all payments made to HSC after that date by Consolidated are held in trust for the Drillers' liens.

The Drillers cite no cases illustrating application of § 162.001(a), and the plain language of the statute does not support the Drillers' claim. All of HSC's interest in the well was transferred to Consolidated in October 2008. R. 732. HSC became the well operator in November 2008 in order to complete construction on the well. R. 907. While Consolidated presumedly paid HSC in order

to complete the work on the well, those funds were never intended for the Drillers – they were intended for the other laborers performing work on the well at that time. Furthermore, drilling is not "construction" under § 162.001(a). *Holley v. NL Industries Acme Tool Co.*, 718 S.W.2d 813, 815 (Tex. App.–Austin 1986).

Secondly, Drillers contend that they are entitled to a constructive trust on any funds held by the Debtors that could be used to pay the Drillers' liens. Two federal cases state that funds held by the owner appropriate to the benefit of subcontractor lienholders. *Green v. H.E. Butt Foundation*, 217 F.2d 553, 554 (5th Cir. Tex. 1954); *Perry v. Wood*, 63 F.2d 257, 257 (5th Cir. 1933). These cases refer to situations where the contractor went bankrupt and there was a dispute as to whether the bankrupt's referee or the lien claimants had priority to funds held by the owner for the satisfaction of such liens. The court in both cases held that the lien claimants had priority.

The Drillers argue that all funds owed to Lake Hills by the Debtors are held in trust for the Drillers, and they contend that they are entitled to the money the Debtors now receive from Trius' withheld production interest.[10] *Perry* and *H.E. Butt* are not analogous to the facts here. Those cases discussed the priority of lienholders and bankrupt referees. Here, the Debtors withheld Trius' production interest as a penalty for not discharging the materialman's liens on the property.

The Drillers further allege that the language of the Option Agreement and Settlement Agreement was for the Drillers' benefit and therefore establishes a fiduciary relationship. In the agreements, the Debtors forgave the substantial debt owed to them by Trius in exchange for Trius disposing of the materialman's liens on the mineral property. A provision in the Option Agreement

---

[10]Debtors argue that the evidence at trial would show they do not in fact owe any funds to Lake Hills. The Court assumes, for the purposes of this opinion, that Lakehills did not receive all funds owed from Debtors.

allowed the Debtors to penalize Trius if it failed to discharge the liens. R. 1974. The Option Agreement stated that money withheld from Trius could be used to satisfy the materialman's liens. R. 1975.

These two agreements do not create a fiduciary relationship. Both contracts explicitly place the responsibility for satisfying the materialman's liens on Trius. While it is true that the Debtors would penalize Trius if it failed to remove the liens, there is no language in the contract that Trius' withheld production interest must be paid to the Drillers. Therefore, there is no plausible claim that a fiduciary duty exists between the Debtors and the Drillers.

Under *Monnig's*, a trust can also be established if an owner behaves fraudulently. 929 F.2d at 201. To state a claim for fraudulent inducement, the plaintiff must allege that a material misrepresentation was made; that when the misrepresentation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; that the speaker made the misrepresentation with the intent that the other party should act on it; and that the plaintiff detrimentally relied on the misrepresentation. *Lewis v. Bank of Am. N.A.*, 343 F.3d 540, 545 (5th Cir. Tex. 2003), *citing In re FirstMerit Bank, N.A.*, 44 Tex. 900 (Tex. 2001).

The Drillers point to the Settlement Agreement in which the Debtors agreed to pay Lake Hills and Stratco the Debtors' 12.5% expenditure obligation, R. 1860, and Stratton's testimony that Todd indicated that HSC would attempt to satisfy the materialman's liens, R. 2325. The Drillers allege that the Debtors made these statements without any intention of fulfilling them, and that Stratton relied on the misrepresentations when he signed the Settlement and Option Agreements and released Lake Hills' and Stratco's operator liens against the Debtors.

These statements, if taken as true, do not establish fraud on the part of the Debtors in inducing Stratton to enter into the Settlement Agreement. First, there are insufficient allegations that the Debtors signed the contract without intention of performing their obligations merely to induce Stratton to sign it as well. The Settlement Agreement also specifically states that Trius is obligated to discharge the materialman's liens. R. 1859, 1974. Stratton testified that he understood the agreement to mean that Trius was obligated to pay the liens. R. 2327. Therefore, it is not plausible that Stratton signed the Settlement Agreement believing that the Debtors would pay the materialman's liens when he knew that Trius was the party contractually responsible for those liens.

In the lack of plausible allegations of a breach of a fiduciary relationship or fraud, the bankruptcy court's dismissal of constructive trust claims by the Drillers was proper. It is not necessary to address whether or not the Debtors were unjustly enriched or if the alleged trust funds can be traced to a *res*. Since there is no plausible claim for breach of fiduciary relationship or fraud, the first prong of the *Haber Oil* test fails and the entire claim of constructive trust fails.

For reasons similar to the constructive trust claims, a claim of an equitable lien also fails. Equitable liens require an express or implied agreement to create a security interest, an intention for specific property to secure the payment, and no adequate remedy at law. *Ronfin Series C Bonds Sec. Interest Litig. v. Naaru*, 182 F.3d 366, 371 (5th Cir. 1999). There are insufficient allegations of an intention to form a security interest, the presence of specific property intended to secure that interest, or the lack of a remedy at law. Therefore, there is no plausible claim for the creation of an equitable trust. The bankruptcy court's dismissal was proper.

D.      *The bankruptcy court did not err in denying leave to amend.*

Drillers argue that the bankruptcy court erred in denying their motion to amend the portions of the complaint related to their constructive trust and equitable lien claims. The bankruptcy court previously allowed Drillers to amend their complaint to add the constructive trust claim over objection by Debtors. R. 3401. The Drillers sought a second opportunity to amend their complaint to cure deficiencies in the constructive trust portion of the complaint. The bankruptcy court did not allow further amendment.

This Court reviews the denial of motions to amend according to an abuse of discretion standard. *See Herrman Holdings Ltd v. Lucent Techs., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (holding that a lower court's denial of permission to amend after the plaintiffs had already twice amended the complaint was not an abuse of discretion); *Dawson v. United States*, 68 F.3d 886, 896 (5th Cir. Tex. 1995) (stating "an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found.") Here, there is no evidence of abuse of discretion. The bankruptcy court had already allowed the Drillers one opportunity to amend the complaint over objection by the Debtors. The Drillers asked for a second opportunity to cure further deficiencies in the complaint if it failed to state a claim. The bankruptcy court reasonably refused second amendment because the Drillers already had two opportunities to state a claim.

E.      *Motion to Strike*

Drillers argue that a statement of Todd in his affidavit improperly influenced the lower court's decision in favor of Debtors. Todd stated in his affidavit that HSC did not participate in the operation of the Hill Well, nor did any "of their authorized agents." R. 756. Drillers argue that such

language is legal speculation and should be struck to clarify the record. Todd's statements are immaterial to the decision of this *de novo* review of the bankruptcy court's decision, so the court need not decide whether or not they should be struck.

## VI.

## CONCLUSION

For the above stated reasons, the Court **AFFIRMS** the bankruptcy court's order granting summary judgment in favor of Appellees. The bankruptcy court's order granting the Motion to Dismiss Additional Claims Asserted in Amended Complaint is also **AFFIRMED**. As such, the bankruptcy court's final judgment dismissing all claims of Appellants is **AFFIRMED**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE